IN THE SUPREME COURT OF TENNESSEE
November 4, 2020 Session[1]

## MILAN SUPPLY CHAIN SOLUTIONS, INC. F/K/A MILAN EXPRESS, INC. v. NAVISTAR, INC. ET AL.

**Appeal by Permission from the Court of Appeals
Circuit Court for Madison County
No. C-14-285        Roy B. Morgan, Jr., Judge**

_____

**No. W2018-00084-SC-R11-CV**

_____

We granted permission to appeal primarily to consider how, if at all, the economic loss doctrine, which generally precludes recovery for purely economic losses in tort actions, applies in Tennessee to claims of fraudulent inducement. We hold that when, as here, a fraud claim seeks recovery of only economic losses and is premised solely on misrepresentations or nondisclosures about the quality of goods that are the subject of a contract between sophisticated commercial parties, the economic loss doctrine applies. Accordingly, we affirm the judgment of the Court of Appeals holding that the economic loss doctrine bars the plaintiff's fraudulent inducement claim. We also affirm the judgment of the Court of Appeals holding that the plaintiff's claim under the Tennessee Consumer Protection Act ("TCPA") is barred as a matter of law because the trucks at issue are not "goods" as that term is defined by the portion of the TCPA on which the plaintiff relied. Tenn. Code Ann. § 47-18-104(b)(7) (2013 & Supp. 2020). We, therefore, set aside the plaintiff's award of attorney's fees and costs based on the TCPA. In all other respects, we affirm the judgment of the Court of Appeals on the separate grounds stated herein.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Court of Appeals Affirmed on Separate Grounds**

---

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Donald Capparella, Tyler Chance Yarbro, Kimberly Macdonald, and James Walker, Nashville, Tennessee, and Marty Phillips and Adam Nelson, Jackson, Tennessee, for the appellant, Milan Supply Chain Solutions, Inc. f/k/a Milan Express, Inc.

Eugene N. Bulso, Jr. and Paul J. Krog, Nashville, Tennessee, Roman Martinez and Charles Dameron, Washington, D.C., and Kevin Jakopchek, Chicago, Illinois, for the appellees, Navistar, Inc. and Volunteer International, Inc.

H. Anthony Duncan, Nashville, Tennessee, Brian G. Brooks, Greenbrier, Arkansas, and John Vail, Washington, D.C., for the amici curiae, Ellen Bublick, John C. P. Goldberg, Jim Rossi, Paul Hayden, Vincent Johnson, Gregory Keating, Tony Sebok, Ben Zipursky ("Law Professors"), and the Tennessee Trial Lawyers Association.

Bradley M. Davis and Nathan L. Kinard, Chattanooga, Tennessee, for the amicus curiae, Tennessee Chamber of Commerce & Industry.

## OPINION

### I. Background

#### A. The Parties

Milan Supply Chain Solutions, Inc., f/k/a Milan Express, Inc. ("Milan"), is a logistics company located in Jackson, Tennessee. Navistar, Inc. ("Navistar") is an Illinois company that manufactures various heavy-duty diesel engines that are used primarily in Navistar's International commercial trucks. Volunteer International, Inc. ("Volunteer") is an independent dealership located in Jackson, Tennessee, which exclusively sells and services new and used Navistar trucks and equipment.[2] Navistar and Volunteer are unrelated entities and have no common ownership or management. This appeal involves Milan's purchase from Volunteer of over 200 Navistar ProStar trucks with MaxxForce engines. The following is a summary of the proof offered at trial.

---

[2] It is not clear from the record whether Milan, Navistar, or Volunteer's corporate names include commas. Briefs filed by the parties do not include commas, but the complaint and the opinion of the Court of Appeals do. For purposes of this opinion, we describe the parties as listed on the face of the complaint.

## B.  Navistar's MaxxForce Engine

Navistar's MaxxForce engine was developed to meet the EPA emissions standards that became effective in 2010.  These standards required manufacturers of heavy-duty trucks to lower nitrogen oxide emissions.[3]  Manufacturers of diesel engines chose one of two emissions technologies to meet the 2010 standards: exhaust gas recirculation ("EGR") or selective catalytic reduction ("SCR").  EGR technology involved "exhaust recirculation, you take a percentage of the exhaust, recycle it back to the intake, and you run it through an EGR valve . . . to regulate it, and you run it through a cooler to cool it because you really can't put hot exhaust back into the intake of the engine.  So the recirculated exhaust moderates or dilutes the combustion so less nitrogen oxides are generated." [4]  EGR technology had been used for thirty or forty years in a variety of engines, but it had never been used to reduce emissions as low as the 2010 EPA standards required.  Manufacturers were concerned that using EGR-only technology would produce excess heat and soot in the engine and reduce engine reliability.

SCR was the other technology available for meeting the 2010 emissions standards.  It had been used in Europe for several years before 2010, but it had not previously been used in North America.  SCR technology required installation of a catalytic converter behind the engine that, according to Milan's expert witness, includes "a small fuel injector that's actually injecting what's called diesel emission fluid, and it's a urea solution that chemically reacts with the nitrogen oxides and just converts it back to nitrogen.  So it's a little chemical factory on the back of the engine . . . ."  For SCR emissions systems, tanks had to be installed on trucks to contain the diesel emission fluid, and drivers had to refill the tanks for the emissions systems to function properly.  SCR technology was not stand alone and was used in conjunction with EGR technology.

When the 2010 emissions standards were initially promulgated in the late 1990s and early 2000s, the EPA and diesel engine manufacturers alike had several concerns with SCR emissions systems.  Unlike Europe, the United States did not have the infrastructure in place to support the system.  Truck stops did not sell diesel emissions fluid, and the fluid was available only at chemical plants at that time.  SCR emissions systems depended on truck drivers refilling the tanks to function properly, and the EPA

---

[3] Prior to 2010, heavy-duty diesel engines were required to produce no more than 1.2 grams per horsepower/hour ("g") of Nitrogen Oxides ("NOx").  The EPA's 2010 standards limited emissions of heavy-duty diesel engines to either: (1) no more than 0.2 grams per g of NOx; or (2) no more than 0.5 grams per g of NOx, making up the difference between the 0.2 and 0.5 through the use of previously earned emissions credits.  The MaxxForce engine was certified compliant under the second option.

[4] Milan's expert witness, Bruce Bunting, provided this description in his testimony.

preferred an emissions system not dependent on driver compliance. Finally, the tank and fluid needed for an SCR emissions system weighed 500 to 600 pounds, so SCR reduced a truck's freight-weight capacity.

Despite these concerns, by the time the 2010 emissions standards became effective, all of Navistar's competitors had adopted SCR technology. Navistar, however, "really wanted not to have all the complexity of SCR" and decided to satisfy the 2010 emissions with an EGR-only emissions system. To this end, Navistar contracted with a well-known diesel engine manufacturer to build an engine with an EGR-only emissions system. The engine manufacturer backed out of the deal late in the process, but Navistar decided to proceed with its plan to produce an engine using EGR-only technology. Navistar dubbed this engine the MaxxForce.[5]

Navistar began the project to produce the MaxxForce engine in October 2007 and knew the project was starting late for the planned January 2010 launch. Rather than building an entirely new engine, Navistar purchased an existing engine from a European manufacturer. This engine had been developed in the 1990s and had been in production since 2002. It was released in 2007 with an EGR-only emissions system designed to limit emissions to no more than 1.2 g of nitrogen oxide. Navistar retained eighty percent of the 2007 base engine, but to achieve compliance with the 2010 emissions standards, Navistar upgraded several components of the EGR-only emissions system, including the EGR cooler and the EGR valve. Navistar purchased eighty percent of these components from other companies, and these companies were responsible for validating the components through bench testing—testing the components to try to get them to break. Navistar also bench tested the components. Additionally, Navistar conducted dynamometer testing, which entails assembling the engine and mounting it on a machine in a lab to test it under various and extreme conditions. For engines with high-mileage life expectancies, like the MaxxForce, Navistar conducted extensive dynamometer testing. Navistar also conducted field testing of its MaxxForce engine.

---

[5] On July 6, 2012, Navistar announced that, like its diesel engine competitors, its next-generation engine of engines would use SCR along with EGR to meet the 0.2 g NOx standard.

At the outset of its development of the MaxxForce engine, Navistar set a dynamometer testing goal of 2.8 million miles and a field-testing goal of 1.2 million miles. Navistar also set a target repair rate of .857 or 850 repairs per 1000 trucks over a two-year period. This target was set by reviewing industry-wide repair data and setting a goal lower than the industry average. Navistar had not met these goals at the beginning of 2010, so it delayed the launch of the MaxxForce engine.

By September 14, 2010, just prior to the launch, Navistar had attained 9,013,520 miles of dynamometer testing and 2,646,415 miles of field testing. Navistar conducted field tests in Alaska, Denver, Colorado, and Las Vegas, Nevada. Ten trucks attained 100,000 field-test miles, and two attained close to 200,000 field-test miles. The life expectancy of the MaxxForce engine was one million miles, but none of the field test vehicles attained this high mileage. Navistar relied on its dynamometer testing to determine the high-mileage reliability and durability of its MaxxForce engine. At the end of testing and just prior to launch, Navistar's predicted repair rate for the MaxxForce engine was .892, just above Navistar's target of .857, about ninety-four percent of its targeted reliability goal. When the MaxxForce engine launched, the reliability group at Navistar was "very confident" because "each of [its] measured goals" had been attained or very nearly attained.

However, Navistar had continued changing and improving its EPA 2010 MaxxForce engine throughout its testing process, so not all of the testing mileage involved the final product sold to customers. Additionally, Navistar's testing revealed problems with some of the components of the EGR-only emissions system. Some of the problems were solved prior to launch, but others were not. In particular, Navistar knew at the time of launch of the potential for premature cracking of the EGR cooler and knew that this potential failure could cause internal coolant leakage into other engine components during the anticipated one-million-mile life of the MaxxForce engine.[6] Nevertheless, Navistar proceeded with the launch in September 2010, and it continued altering and improving the engine after the launch.

---

[6] Navistar also identified a problem with the EGR valve during testing but solved at least part of that problem prior to launch.

### C. 2011 and 2012 Milan Truck Purchases

Milan and Volunteer had a close business relationship that began in the 1980s. International trucks Milan purchased from Volunteer comprised fifty percent of its fleet.[7] Milan was Volunteer's biggest customer. John Ross, who served as president of Milan until 2014 and remained on the Board of Directors at the time of trial, described Volunteer as "an excellent partner" and said it had "always bent over backwards to take care of [Milan], to meet [its] needs."[8]

In early 2011, Milan became interested in purchasing new trucks because "the maintenance costs [of Milan's older trucks] were just going through the roof, and on top of that, they were not very fuel efficient." By the time Milan began its search for new trucks, all the manufacturers had launched trucks with engines compliant with 2010 EPA emissions standards. Milan wanted to give Volunteer its business, if possible, because Volunteer had been a great partner, had helped Milan through tough financial times, and Milan's "desire was to honor [Volunteer] with business, depending on what the product, you know, being reliable and meeting [its] needs." However, Mr. Ross also talked with two of Navistar's competitors, Volvo and Freightliner, because he had concerns about Navistar choosing the EGR-only emissions system when the rest of the industry had opted for SCR technology. Mr. Ross said the Volvo and Freightliner dealers cautioned him that Milan would have issues with the Navistar MaxxForce engines and would not be "happy with the EGR." According to Mr. Ross, Navistar's competitors were "really talking up the heat that would be produced by these engines" and were saying "basically that we were not going to be satisfied with the reliability of the engines, and the heat was going to cause damage and strain to the engines, to the major components."

---

[7] Milan had as many as 1,000 trucks in its fleet at one time, and at the time of trial had a fleet of approximately 350 trucks.

[8] Mr. Ross explained that, when Milan experienced financial difficulties following the 2008 economic downturn, Volunteer purchased new International trucks in 2009 and leased them to Milan because Milan did not have the financial resources to finance trucks on their own. When Milan's maintenance director retired, Mr. Cooper provided a trusted Volunteer employee at Volunteer's expense to manage Milan's maintenance shop for more than a year, from April or May 2011 through October or November 2012.

Volunteer worked to gain Milan's business, so in April 2011, Volunteer offered to loan Milan two of Navistar's ProStar trucks equipped with the MaxxForce engines. Milan accepted the offer and used the trucks free of charge for two months. Soon thereafter Mr. Ross met with representatives from Volunteer and Navistar[9] to negotiate the terms and conditions of purchasing more ProStar trucks with MaxxForce engines. Mr. Ross testified that Milan wanted "to hear from Navistar, you know, since it was a new engine and . . . we wanted to know how - - how it was going to be reliable, was it going to be reliable" and recalled that he particularly wanted to hear about field testing because he did not want to "wake up one day and have buyer's remorse on this [EGR] technology." According to Mr. Ross, Navistar representatives told him that Navistar "had performed extensive testing, rigorous extensive testing, millions of miles over the last several years up to that point, you know, that the testing had enabled them to flush out any issues, problems that they were having with the engines." Mr. Ross said he was told that the testing had proven the engine's reliability, that "all feedback [on the trucks] was positive," and that the "major components" of the engine, including EGR coolers and EGR valves, would last a million miles. Mr. Ross said he was not told of any concerns about the adequacy of Navistar's field testing or any negative customer feedback. Mr. Ross agreed that he had taken all the sales pitches with a grain of salt. He also acknowledged that the ProStar trucks with MaxxForce engines were less expensive than the price estimates for trucks Navistar's competitors had provided him.

After this meeting, Milan decided to give its business to Volunteer. On three separate occasions in 2011 and 2012, Milan ordered a total of 243 ProStar trucks with MaxxForce engines.[10] The cost of each truck ranged from $125,000 to $130,000, and the total cost of all trucks was approximately thirty million dollars. The trucks were delivered on fourteen occasions from 2011 to 2013, and Milan signed financing and purchase agreements when the trucks were delivered, not when the orders were placed. It could have cancelled the trucks at any time before their delivery.

Under the terms of the purchase agreements, the trucks were subject to Navistar's standard "Limited Warranty," which covered non-engine vehicle components for twelve months or 100,000 miles, and engine components for two years. Milan also purchased an "Optional Service Contract," which extended the warranty coverage on certain components for up to seventy-two months.

---

[9] Navistar's representatives included Dave Lyons and Tom DeBlossi, and Brent Cooper represented Volunteer at the meeting.

[10] Milan later cancelled a few of the trucks it ordered, but it purchased more than 230 trucks. None of the trucks Milan purchased were the 2010 models, which were the most problematic in terms of EGR cooler and EGR valve failures.

These agreements (collectively referred to herein as "Warranties"), required Navistar to repair or replace covered truck components that proved defective in material and/or workmanship in normal use and service. Under a bolded, capitalized, and underlined heading of "**WHAT IS NOT INCLUDED**," the Warranties specifically excluded coverage for "[l]oss of time or use of the vehicle, loss of profits, inconvenience, or other consequential or incidental damages or expenses." The Warranties also included another bolded, capitalized, italicized, and underlined heading of "***DISCLAIMER***" beneath which the following text appeared:

> NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. THE COMPANY SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OTHER REPRESENTATIONS TO THE USER/ PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. THE COMPANY FURTHER EXCLUDES LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES ON THE PART OF THE COMPANY OR SELLER.

Milan ordered the first fifty-nine trucks ("first order") in July 2011. Milan began receiving delivery of the first order in late summer or early fall of 2011, with the bulk of the trucks arriving in late 2011.

According to Mr. Ross, the Navistar and Volunteer representatives returned in January 2012 for another meeting. They did not provide any new information but reiterated the information given during the Spring 2011 meeting regarding the rigorous field testing, the million-mile components, and Navistar's confidence in its EGR-only technology. Mr. Ross stated that the Navistar representatives also did not disclose any negative customer feedback, discuss any concerns about field testing, or disclose any changes to or problems with the EGR valve and EGR cooler. At the end of this meeting, Milan ordered 150 more trucks ("second order"), bringing the total to 209. Milan received delivery of the second order throughout 2012 and had received all 150 trucks by the end of 2012.

At some point in 2012, Milan began experiencing problems with some of the trucks. Navistar made all repairs pursuant to the Warranties, and Milan accepted the repaired trucks and returned them to service. Milan averaged 104,000 miles per year on the trucks.

In late 2012, Mr. Ross told Navistar that Milan still needed trucks, but he also expressed concern that the trucks were going into the shop more than Milan had anticipated. In November 2012, Mr. Ross and another Milan employee met with a group of Navistar and Volunteer representatives at the Flat Iron Grill in Jackson, Tennessee. By this time, Mr. Ross believed the Navistar trucks had "significant reliability problems," that their "repair rate was too high," and that "the trucks were not as reliable as represented." According to Mr. Ross, Navistar and Volunteer "reassure[d him] that they were aware of the issues, and [that] they were fixing the issues." About a month after this meeting, in December 2012, Mr. Ross ordered thirty-four more trucks, bringing the total to 243.

Milan continued experiencing failures with the trucks, so in 2013, it ran an analysis, which, according to Mr. Ross, showed that the failures on the new trucks were continuing and even increasing. Mr. Ross said that he provided the data to Navistar and Volunteer and asked for a remedy, but the situation was not resolved to Milan's satisfaction.

### D. The Litigation

On November 13, 2014, Milan filed suit against Navistar and Volunteer, alleging breach of express and implied warranties, breach of contract, negligent misrepresentation, fraud, and a Tennessee Consumer Protection Act ("TCPA") claim. After extensive discovery, the trial court granted Navistar and Volunteer summary judgment on Milan's breach of contract and breach of warranty claims, explaining that Navistar had "fulfilled its obligations under [the] warranties by repairing or replacing parts when [Milan] presented the subject trucks for repairs covered by the warranties and returning the trucks to operable condition." The trial court also recognized that Navistar had "conspicuous[ly]" and "effectively disclaimed any implied warranties" and that Milan had not presented any "evidence establishing the existence of a contract to provide trucks 'free from defects' or the breach of any such contract." The trial court also granted summary judgment on Milan's negligent misrepresentation claim, concluding that it was barred by the economic loss doctrine.[11] The case proceeded to trial on Milan's fraud and TCPA claims.

---

[11] In their summary judgment motion, Navistar and Volunteer did not argue that the economic loss doctrine barred the fraud claim. Milan has not appealed the trial court's ruling that the economic loss doctrine bars its negligent misrepresentation claim.

Milan offered proof to show that Navistar's field testing was inadequate and that Navistar knew it was inadequate. Milan also offered proof to show that Navistar knew major components of the EGR-only emissions system were flawed and would fail well before the million-mile life of the engine. Milan also offered proof to show that Navistar had received negative feedback from customers shortly after launching the ProStar truck with MaxxForce engines because of major problems with the engine programming in the first trucks.

Milan presented videotaped deposition testimony of Jim Hebe, Navistar's senior vice president of sales and marketing from 2008 until February 2014. Mr. Hebe testified that the launch of the trucks was delayed because Navistar could not get trucks to run properly in field tests. Mr. Hebe did not dispute that Navistar had achieved the field-testing mileage goals it initially set. Rather, he said that none of the vehicles used in field-testing achieved high mileage, so Navistar's field-testing was inadequate to flush out any problems that might, and ultimately did, manifest during the high-mileage life of the engine. Mr. Hebe remarked that Navistar "didn't test shit" on the final product, explaining that Navistar never really had a final product because it made numerous changes to the engine from the time it launched the product until it discontinued the EGR-only MaxxForce engine in July 2012.

Mr. Hebe also said that Navistar knew about the unresolved problems with the EGR valve and EGR cooler when it launched the engine and knew that these components would cause engine failures after trucks were sold to customers. Mr. Hebe said that Navistar also knew that these problems could not be fixed short of redesign solutions that had not been achieved at the time of launch. Along these same lines, Milan presented proof of the many design changes and quality improvements Navistar made to the EGR valve and EGR cooler between October 2010 and July 2012.

Milan introduced Navistar's pre-launch documents that showed its estimate of the "best case scenario" life of the EGR cooler was 225,000 miles, meaning Navistar knew this component would need to be replaced four to five times over the life of the one-million-mile engine. Milan also presented proof that the EGR coolers in the first model year engines, which were not actually the engines in the trucks Milan purchased, failed at a rate of one-hundred percent during the first two years of service, or at approximately 225,000 to 250,000 miles. The failure rate improved to eighty percent and fifty percent for the EGR coolers in the MaxxForce engines Milan purchased, but the problems were never resolved.

Milan also presented proof to show that Navistar learned more about the defects with the engine soon after its 2010 launch, when warranty claims began to increase. According to Milan's proof, Navistar continued to learn more about the problems with

the MaxxForce engine in 2011 and 2012. However, Navistar never disclosed these problems to customers.

As an example of Navistar's knowledge, Milan introduced a March 20, 2012 email from Navistar's former senior vice-president of engineering, which stated: "There needs to be some pride in our group to actually want to take the all-time worst engine, (reliability), in the industry, and make it the best. I want to do this."

As another example, Milan presented a December 1, 2012 email from Dennis Mooney, who joined Navistar in January 2010 as vice-president of global engineering and assumed responsibility in early 2011 for vehicle, truck, and engine engineering. By early 2013, Mr. Mooney had been promoted to senior vice-president of product development. Mr. Mooney's email was addressed to Troy Clarke, who later became CEO of Navistar. The email stated:

> Troy, some thoughts on our current quality and I know you have heard this before.
>
> The entire Auto and HD truck industry standard is [forty-eight] months for a new engine/emissions system development. The first [twenty-four] months is development and component and subsystem testing, the second [twenty-four] months is real DV validation at the vehicle level. You need two winters and two summers to complete all testing and problem resolution. This is industry standard, Toyota, GM, BMW, Honda, Mercedes, . . . . You can try and fool with this, but you pay the price.
>
> We made the decision to go with EGR instead of SCR approximately [eighteen] months ahead on start of production (late 2008). We also did not have clear technical path on how to achieve. The hardware to do this (cooler, EGR valve, low temperature radiator, Norgren valve, turbo, …) was all new. When I got here on January of 2010, we were still finalizing DV design, [six] month[s] before SOP! We had no time to validate and get miles on trucks [. . . .] [F]ield test trucks were essentially engineering development trucks. Hardware was changing weekly as we were finding and trying to fix problems, many of which were infant mortality problems. We never saw the higher mileage stuff (EGR valves breaking, cooler plugging and cracking (the plugging and cracking we saw was low miles and were Norgren valve, CAP and manufacturing related) and turbo seals) because we had no high mileage experience.
>
> On the cooler, we did not know the physics you saw yesterday on fin surface temperatures and plugging. The chart you saw yesterday was from

- 11 -

a UM study for Ford th[at] was published in 2011. We did not have a minimum fin temperature requirement in our original DVP. The industry continues to learn about coolers and plugging. Interestingly, we hired Steve Nash from GM, he ran the Powertrain Test Lab in Pontiac for several years. One of their biggest quality issues is EGR cooler plugging. They have a GM research activity ongoing for coolers.

If we put together a timeline of events, overlaid by [forty-eight] month standard development time, you will see we have been discovering and fixing issues that would have come out in the second [twenty-four] month[s] of development.

You and I were not here, but Dee and Dan (with Gurminder's help) drove this strategy. Eric was running engine and they fired the head of engine Engineering (Helmut?) in December of [2008] as he wanted to do SCR. As you know, the entire automotive, HD truck and off-highway industries went with SCR. The willing workers busted their asses to make this work[.] No backup strategy! Do or die.

By the way, if anybody had listened to [Tom] Cellitti in 2010, he said over and over we had no field testing. All his "field test" trucks were engineering development, not even validation. We had no choice but to launch in June of 2010. It was that or go out of business.

Milan also elicited testimony on cross-examination from Jack Allen, who worked for Navistar for twenty-five years and was the Chief Operating Officer when the MaxxForce engine was launched. Mr. Allen stated that Navistar had no obligation to disclose to customers all of the potential problems it had identified during testing and development. Mr. Allen explained that launching products despite having unresolved potential problems is "normal business" and that Navistar's Warranties are provided to address potential problems that may arise after a customer purchases the products. Mr. Allen explained, "Sir, you go buy a car. Do they tell you everything you can expect when you buy a car? When you go buy a car, do they tell you in four years the car is going to be worth X? This is normal practice in business . . . ."

Milan's expert, Dr. Bunting, testified that, while EGR emissions technology was generally reliable when Navistar utilized it, it had never been used to achieve emissions as low as the 2010 EPA standards required. Dr. Bunting explained that all of Navistar's competitors had concluded that EGR-only technology could not reliably be used to reduce emissions to the level of the 2010 EPA emissions standards because doing so required recirculating too much heat through the engine, which produced soot that caused EGR cooler and EGR valve failures.

Milan also offered proof, largely from Mr. Ross, designed to convince the jury that it would not have purchased the trucks had Navistar not misrepresented or failed to disclose the inadequacies of its field-testing, the problems it had identified with the EGR coolers, the programming problems it experienced with the engines shortly after launch, and the flaws it had identified with using EGR-only technology.

Regarding damages, Mr. Ross testified that the trucks' repeated failures resulted in lost profits to Milan. Mr. Ross stated that the truck failures frustrated Milan's drivers and operations personnel and made it more difficult for Milan to meet customers' needs and to recruit and retain drivers. Mr. Ross described the longstanding industry-wide shortage of drivers and said recruiting and retaining drivers is difficult in the normal course of business but that the Navistar truck breakdowns made it even more difficult for Milan to recruit and retain drivers, who depend on reliable trucks to earn a living.

Mr. Ross further testified that, when the problems with Navistar's MaxxForce engine became known in the industry, the resale value of Milan's trucks declined severely, and as a result, Milan sustained benefit-of-the-bargain damages.

Milan also offered expert proof that the Navistar trucks had more than three times the industry repair rate. At their worst performance, the trucks averaged three dealer visits per year for repairs, in addition to scheduled maintenance. At their best, the trucks required 1.3 dealer visits per year.

To support its claim for benefit-of-the-bargain damages—the difference between the value of the property Milan received and the value of the property had Navistar's representations been true—Milan presented the expert testimony of Richard Lolmaugh, a professional equipment appraiser. Mr. Lolmaugh testified that Milan received less for the trucks it sold to third parties than it would have received had the trucks depreciated in a typical fashion. Mr. Lolmaugh calculated damages for the trucks Milan was still operating by estimating what Milan would have received on certain "hypothetical trade date[s]" had Milan resold them and then subtracted that amount from his calculation of what the trucks "should" have sold for on those dates, absent the alleged fraud.

Navistar objected to this testimony, arguing that Tennessee law measures benefit-of-the-bargain damages as the difference between the actual value the buyer received at the time of making the contract and the value the property would have had at the time of contracting had the representations of the seller been true. The trial court overruled this objection.

Milan also offered proof to support its claim for lost profit damages. Milan had no contemporaneous records showing customers or loads it lost from the days the trucks were out of service for repairs. Rather, Milan used dispatch records to determine the total number of days the trucks were out of service for repairs ("down days"). It also calculated a single figure for the marginal profit earned per day ("profit per day") on a truck in service. Milan claimed as lost profits the product of multiplying down days by profit per day.

Navistar objected to this proof, arguing that it was too speculative. Navistar pointed out that Milan had not subtracted days when spare trucks were available, had not determined whether loads were lost because of the down days, and had not calculated whether Milan had drivers available for the out-of-service trucks on down days. The trial court overruled this objection.

At the close of Milan's proof, Navistar and Volunteer moved for a directed verdict. The trial court granted the motion as to Volunteer, noting that Milan had failed to present any proof of Volunteer making misrepresentations or failing to disclose material facts that should have been disclosed. The trial court denied the motion as to Navistar.

Navistar then presented its proof. As to Milan's claims that Navistar representatives made false statements about or failed to disclose material facts in pre-sale negotiations, Navistar representatives denied that any such blanket guarantees were ever made. Navistar's representative at trial, Bill Krohn, who served as director of reliability and quality at Navistar at the time the negotiations would have occurred, testified that EGR coolers and valves were never intended to last for one million miles, that no company in the industry had achieved one million miles for EGR coolers, that the EPA's expected life for emissions systems was 435,000 miles, and that Navistar had a goal for EGR coolers and valves of 400,000 to 500,000 miles, with a ten percent failure. Navistar also elicited testimony to show that no written record existed of any representations Navistar and Volunteer representatives made at the pre-sale meetings.

Other Navistar personnel generally denied discussing field testing with Mr. Ross and said that Mr. Ross was not concerned with field testing but was interested in fuel economy and price. Navistar representatives testified that on fuel economy and price, the MaxxForce engine surpassed competitors' SCR engines.

Navistar acknowledged knowing at the time of launch that some EGR coolers would fail but denied having any duty to disclose this potential to Milan or other customers and denied having any understanding of the severity of the potential problem. Navistar's witnesses testified that product manufacturers typically know of potential problems with new products and generally have no industry-recognized duty to disclose

potential problems to customers. Tim Tindall, a former chief engineer and executive for a Navistar competitor, testified that Navistar's testing and continuous improvement process was typical of and consistent with industry standards and that it was not unusual for a manufacturer to launch a product with knowledge of unresolved potential future problems.

Navistar took the position that the Warranties it provided to customers were intended to cover such potential problems, and it offered proof to show that, in fact, it had covered all of Milan's warranty claims. Navistar offered proof to show that, with respect to the MaxxForce engines, it spent "over one billion dollars" either proactively repairing and replacing parts before they failed or honoring warranty claims that it could have contested.

Navistar also offered proof to show that even taking account of the potential problems it knew about at the time of launch, its reliability models projected that the MaxxForce engine would exceed Navistar's goals and have fewer failures than previous Navistar engines. Navistar presented proof that its initial warranty data after launch was in line with the pre-launch projections. When Navistar's incidence of repairs rose, Navistar publicly disclosed that its warranty costs were higher than expected.

Navistar also offered proof to show that Milan's trucks had an overall average of 2.33 engine service visits per year, compared to the industry standard of one to two such visits per year. The trucks Milan purchased after the November 2012 meeting averaged 1.3 engine repair visits per year.

Navistar countered Milan's proof by emphasizing that Mr. Hebe had been responsible for sales at Navistar, not for testing or engineering. Navistar produced documents showing that it had met its testing goals for the MaxxForce engine prior to launch. As for Mr. Mooney's December 2012 email, Navistar witnesses, including Mr. Mooney, explained that the email was based on the false premise that Navistar developed a new engine, when, in fact, Navistar had built the MaxxForce by modifying an existing engine, so the new engine testing standards Mr. Mooney described did not apply to the MaxxForce engine. Mr. Mooney recanted his statement that the engine should have been tested for forty-eight months. Mr. Mooney said that he had been unaware when he wrote the email that Navistar began with an existing engine and pointed out that he did not begin working at Navistar until January 2010, on the eve of the MaxxForce engine's launch.

Tom Celliti denied saying that Navistar had not conducted any field testing—the statement Mr. Mooney had in the email attributed to Mr. Celliti. Mr. Celliti declared that Navistar had field-tested the MaxxForce engine, that it had spent at least fifteen million dollars on field testing, that he had actually driven some of the field-test vehicles, and that the field-testing had been adequate and consistent with industry requirements for field-testing a new emissions system.

Navistar's witnesses also explained that the heavy-duty truck industry has a small universe of customers and that Navistar had no motive whatsoever to defraud customers by launching and selling an inferior and defective product. Doing so, these witnesses explained, would have cost Navistar business and money, given its standard repair and replacement warranties.

Navistar also attempted to establish that Milan could not prove an element of its fraud claim because, even assuming the alleged misrepresentations and nondisclosures occurred, Milan had not reasonably relied upon them. To this end, Navistar elicited testimony about Milan's and Volunteer's close business relationship, highlighted the accommodations Volunteer had made for Milan, and pointed to Mr. Ross's testimony that Milan wanted to give Volunteer its business to repay Volunteer, and also pointed to Mr. Ross's testimony that he took sales pitches with a grain of salt and his testimony about the negative information he learned from Navistar's competitors about potential problems with the MaxxForce engine.

Navistar also sought to introduce the disclaimer portion of the Warranties as proof relevant to negating Milan's reliance. This disclaimer proof would have indicated that Navistar had not made any representations about the quality of the trucks other than the written representations in the Warranties. The trial court refused to admit this evidence, however, ruling that, under the law in Tennessee, parties may not exculpate themselves from fraud claims, that the disclaimers were irrelevant to Milan's fraud claims, and that the disclaimers were unduly prejudicial.

Finally, Navistar called witnesses to counter Milan's proof on its damages claim. As to lost profits, Navistar offered the expert testimony of an accomplished accountant, who stated that the methodology Milan used to calculate lost profits was flawed and inflated in Milan's favor for several reasons. First, Navistar's expert found numerous errors in the count of down days. For example, on one occasion, 113 down days were counted when the truck was actually down for no more than eight days. Down days were included even if the engine repair was made during a scheduled maintenance visit. The calculation also included down days that were attributable to Milan's delay in promptly returning a truck to service after it had been repaired. Milan also had counted all out-of-service days as down days without determining whether Milan had spare trucks available to replace the out-of-service truck or whether the out-of-service truck would have had a

load or a driver. Navistar's expert also found flaws with Milan's calculation of profit per truck, because the calculation had not accounted for certain costs of operating the trucks. Finally, Navistar's expert opined that Milan's business records showed its profits increased during the years in question, which was counterintuitive to and inconsistent with its claim of lost profits.

To further counter Milan's lost profit claim, Navistar elicited proof that Milan did not lose a customer or a load as a result of the truck failures and down days, that because of the industry-wide driver shortage, Milan always had more trucks than drivers, and that Milan likely had spare trucks to replace out-of-service trucks while repairs were made.

Navistar also offered proof that Milan used the Navistar trucks for an average of 104,000 miles per year, for a total of sixty-five to seventy million miles, and was still using some of the trucks at the time of trial, and had resold some of the trucks.

Milan rested its case without offering rebuttal proof.

### E. The Verdict and Post-Trial Litigation

After closing arguments, the jury returned a verdict for Milan on both the fraud claim and the TCPA claim. The jury awarded Milan $8,236,109 in benefit-of-the-bargain damages and $2,549,481 in lost profit damages, for a total of $10,785,590 in compensatory damages. The jury also found that Milan was eligible for an award of punitive damages.

The case proceeded to a second hearing on punitive damages. Milan, which bore the burden of proof on the issue, elected not to present any additional proof. Navistar also chose not to present proof. Counsel for each party presented argument to the jury. After deliberating for a short time, the jury returned with a verdict awarding Milan $20,000,000[12] in punitive damages against Navistar.

Navistar filed post-trial motions, including a "Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, for a New Trial," raising various challenges to the jury's determinations of liability and damages. As relevant to this appeal, Navistar argued that the economic loss doctrine bars Milan's fraud claims and that Milan's TCPA claim fails as a matter of law because the trucks are not "goods" as that term is defined by the TCPA. Navistar also challenged several of the trial court's

---

[12] Milan elected to receive punitive damages rather than treble damages under the TCPA.

evidentiary rulings, including, as relevant to this appeal, the trial court's refusal to admit the written disclaimers Milan signed.

On December 18, 2017, the trial court denied Navistar's motions, entered judgment on the jury's verdicts for compensatory and punitive damages, and awarded Milan a total judgment against Navistar of $30,785,590. It also awarded Milan attorneys' fees against Navistar under the TCPA of $1,337,800 and discretionary costs of $43,755.37. The trial court also awarded Volunteer attorney's fees of $283,821.75 and discretionary costs of $45,642.27 against Milan, finding that Milan's TCPA claim against Volunteer lacked a factual basis.

Both Navistar and Milan appealed the trial court's decision. Navistar raised eight issues, including, as relevant to this appeal, its arguments that the economic loss doctrine bars Milan's fraud claim and that the TCPA claim fails as a matter of law because the trucks are not goods. Navistar also argued that the trial court committed reversible error by refusing to admit the disclaimers into evidence. In its cross-appeal, Milan argued that the trial court erred by awarding Volunteer attorney's fees and costs and by granting Navistar summary judgment on its warranty claims.

The Court of Appeals ruled in favor of Navistar and Volunteer and against Milan. Specifically, the Court of Appeals held that the economic loss doctrine bars Milan's fraud claim, that the trucks do not qualify as "goods" for purposes of the TCPA, that Milan waived its argument that the trial court erred by granting summary judgment on its breach of warranty claims, and that the trial court properly awarded Volunteer attorney's fees and costs. Milan Supply Chain Sols. Inc. v. Navistar Inc., No. W2018-00084-COA-R3-CV, 2019 WL 3812483, at \*7–9 (Tenn. Ct. App. Aug. 14, 2019), perm. app. granted, (Tenn. Jan. 16, 2020). We granted Milan's application for permission to appeal.

## II. Standards of Review

Whether the economic loss doctrine applies in a particular case is a question of law to which de novo review applies. See Lincoln Gen. Ins. Co. v. Detroit Diesel Corp., 293 S.W.3d 487, 488 (Tenn. 2009) (stating that whether Tennessee recognizes an exception to the economic loss doctrine is a question of law).

The question of whether the trucks are "goods" under the TCPA requires us to construe statutes. "Statutory construction also is a question of law to which de novo review applies on appeal." Johnson v. Hopkins, 432 S.W.3d 840, 844 (Tenn. 2013); Fayne v. Vincent, 301 S.W.3d 162, 169 (Tenn. 2009) ("The construction of a statute and its application to the facts of a case are questions of law.").

De novo review also applies to Milan's claim that the trial court erred in granting Navistar summary judgment on its warranty claims. Rye v. Women's Care Ctr. of Memphis, 477 S.W.3d 235, 250 (Tenn. 2015).

As for Navistar's claim that the trial court erred by refusing to admit the disclaimer into evidence, the abuse of discretion standard applies. State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015). This standard also applies to our review of Milan's claim that the trial court erred in awarding Volunteer attorney's fees under the TCPA. Taylor v. Harris, No. M2008-01579-COA-R3-CV, 2009 WL 2971047, at *1 (Tenn. Ct. App. Sept. 9, 2009).

An abuse of discretion occurs when a trial court "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." Borne v. Celadon Trucking Servs., Inc., 532 S.W.3d 274, 294 (Tenn. 2017) (internal quotation marks and alterations omitted); see also Herron, 461 S.W.3d at 904.

## III. Analysis

### A. Economic Loss Doctrine

#### 1. Historical Development of the Economic Loss Doctrine

The economic loss doctrine[13] is a judicially-created rule of relatively recent vintage. It was developed in response to modern products liability law from a concern that products liability and tort law would erode or consume contract law. See Lincoln Gen. Ins. Co., 293 S.W.3d at 488; see also David v. Hett, 270 P.3d 1102, 1105 (Kan. 2011) (citing Sapp v. Ford Motor Co., 687 S.E.2d 47 (S.C. 2009)). It has been described as a "judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." Plourde Sand & Gravel v. JGI E., Inc., 917 A.2d 1250, 1253 (N.H. 2007) (quoting Tietsworth v. Harley-Davidson, Inc., 677 N.W.2d 233, 241 (Wis. 2004)).[14]

---

[13] Courts and commentators also refer to this concept as the economic loss rule. See, e.g., LAN/STV v. Martin K. Eby Const. Co., 435 S.W.3d 234, 235 (Tex. 2014). These terms are used interchangeably in this decision.

[14] "The most general statement of the economic loss rule is that a person who suffers only pecuniary loss through the failure of another person to exercise reasonable care has no tort cause of action

The doctrine's origins are often traced to a 1965 decision of the California Supreme Court, Seely v. White Motor Co., 403 P.2d 145 (Cal. 1965), which explained:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.

Seely, 403 P.2d at 151.[15]

Twenty-one years later, the United States Supreme Court, exercising its admiralty jurisdiction, considered the economic loss doctrine. E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986). By that time Seely had become the "majority land-based approach." Id. at 868. In East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986), Seatrain Shipbuilding Corp. contracted with Transamerica Delaval, Inc. to design, manufacture, and supervise the installation of four turbines on four oil-transporting supertankers. Id. at 859. After completion, Seatrain transferred title to another entity, which in turn chartered the ships to others. After three supertankers

---

against that person." Jay M. Feinman, The Economic Loss Rule and Private Ordering, 48 Ariz. L. Rev. 813, 813 (2006).

[15] As one commentator has noted, "[u]ntil the 1950s, limiting doctrines such as privity and restrictive liability rules in misrepresentation and negligence made it virtually impossible for a third party to recover for negligently-inflicted economic loss. The economic loss rule was not formally stated in this era only because it was not needed." Feinman, supra, at 815 (footnote omitted); see also Sidney R. Barrett, Jr., Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis, 40 S.C. L. Rev. 891, 897 (1989) ("Judicial hostility to the use of tort theory to recover purely economic losses predates the twentieth-century battle over product liability.").

were in use, a turbine on one malfunctioned but damaged only itself. Two other supertankers were inspected and similar damage was discovered and repaired with replacement parts. The fourth ship, completed after the problem was discovered, did not experience the same problem, but its turbine was damaged because a part had been incorrectly installed, requiring different repairs. Id. at 859–61.

Seatrain and the charterers sued for breach of contract, warranty, and tort, but the statute of limitations barred the contract and warranty claims. Seatrain dropped its lawsuit, but the charterers amended their complaint to allege five tort claims: four claims asserted strict liability against the manufacturer for the design defects that damaged the turbines on each ship, and the fifth claim alleged that the manufacturer had negligently supervised installation of the incorrectly installed part that caused damage to the fourth ship. The charterers sought damages for the costs of repairing the supertankers and for their lost income. Id. at 861.

The Supreme Court began its analysis by recognizing that products liability had grown "out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty." Id. at 866 (citing Seely, 403 P.2d at 149). The East River Court then famously declared that, "if this development were allowed to progress too far, contract law would drown in a sea of tort." Id. (citing Grant Gilmore, The Death of Contract 87–94 (1974)). The Court described the issue before it as "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation." Id. Ebbing the rising tide of products liability law, the East River Court answered this question in the negative and held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." Id. at 871.

The East River Court provided several justifications for this ruling. First, it noted that "[t]he tort concern with safety is reduced" when a product injures only itself and does not cause personal injuries. Id. It next noted that losses sustained by a commercial user when a product injures itself are typically losses, such as the value of the product, which can be insured against. Id. at 871–72. On the other hand, "[p]ermitting recovery [in tort] for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums" and make it "difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product." Id. at 874.

The East River Court explained that "[d]amage to a product itself is most naturally understood as a warranty claim" and "means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'" Id. at 872 (quoting James J. White and Robert S. Summers, Uniform Commercial Code 406 (2d ed. 1980)). Because "[t]he maintenance of product value and

quality is precisely the purpose of express and implied warranties," the Court concluded that claims involving damaged or nonworking products can be brought as breach-of-warranty actions.  Id. (citing U.C.C. §§ 2-313, 2-314, 2-315).  "Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract."  Id. (citing U.C.C. §§ 2-601, 2-608, 2-612).

The East River Court described "contract law, and the law of warranty in particular," as "well suited to commercial controversies" because "the parties may set the terms of their own agreements."  Id. at 872–73.  The East River Court noted that manufacturers may limit liability, disclaim warranties, or exclude remedies, and in exchange, purchasers may negotiate lower prices for products.  Id. at 873.  Key to this give and take, the Court emphasized, is the fact that commercial transactions generally do not "involve large disparities in bargaining power."  Id.

As one commentator has aptly noted, the East River rationale may be distilled into three different jurisprudential concerns:

> (1) the theoretical difficulties of using conduct-oriented tort standards to protect expectancy interests created by contract; (2) the practical difficulty in fashioning a rule that permits recovery for economic loss without subjecting the defendant to potentially limitless liability; and (3) conflict between an expanded duty in tort and the manufacturer's rights under the Uniform Commercial Code.

Sidney R. Barrett, Jr., Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis, 40 S.C.L. Rev. 891, 897 (1989).

### 2. Modern Status of the Economic Loss Doctrine

A majority of jurisdictions have now adopted the economic loss doctrine.  R. Joseph Barton, Note, Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims, 41 Wm. & Mary L. Rev. 1789, 1801 (2000) ("[T]he overwhelming majority of jurisdictions have adopted the economic loss doctrine in one variation or another.").  Despite its wide acceptance, however, the economic loss doctrine has been aptly described as "one of the most confusing doctrines in tort law."  Id. at 1789.  This confusion is largely attributable to the fact that there are "a number of permutations," which has made the doctrine "difficult to define."  David, 270 P.3d at 1105; see also Vincent R. Johnson, The Boundary-Line Function of the Economic Loss Rule, 66 Wash. & Lee L. Rev. 523, 525–26 (2009) ("There are many variations of the rule . . . ." (footnotes omitted)); Andrew Gray, Note, Drowning in a Sea of Confusion: Applying the Economic Loss Doctrine to Component Parts, Service Contracts, and Fraud, 84 Wash. U.L. Rev. 1513, 1513–14 (2006) ("The vast confusion over this area of the law

is demonstrated not only by the language commentators use to describe the doctrine, but also by the number of cases appealing misapplications of the doctrine." (footnote omitted)); Herbert Bernstein, Civil Liability for Pure Economic Loss Under American Tort Law, 46 Am. J. Comp. L. 111, 125 (1998) ("[T]he American law of liability for purely economic losses is much less well settled and less uniform than one might wish it to be."). One commentator has described the economic loss doctrine as a "constellation of somewhat similar doctrines that tend to limit liability" but work in different ways in different contexts, for not necessarily identical reasons, "with exceptions where the reasons for limiting liability were absent." Oscar S. Gray, Some Thoughts on "The Economic Loss Rule" and Apportionment, 48 Ariz. L. Rev. 897, 898 (2006) (footnotes omitted); see also Jay M. Feinman, The Economic Loss Rule and Private Ordering, 48 Ariz. L. Rev. 813, 813 (2006) ("Because the rule applies to a diverse range of situations, there is not one economic loss rule, but several.").

The confusion is compounded because most states have not limited the doctrine to the products liability context, in which it originated. See Barton, supra, at 1802 ("Although the rule originated in the context of products liability, the current trend expands the rule to apply in other contexts, most notably in real property transactions and service contracts." (footnote omitted)); see, e.g., LAN/STV v. Martin K. Eby Const. Co., Inc., 435 S.W.3d 234, 249 & n.60 (Tex. 2014); Fireman's Fund Ins. Co. v. SEC Donohue, Inc., 679 N.E.2d 1197, 1200 (Ill. 1997). But see Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc., 110 So. 3d 399, 407 (Fla. 2013) ("Our experience with the economic loss rule over time, which led to the creation of the exceptions to the rule, now demonstrates that expansion of the rule beyond its origins [in products liability] was unwise and unworkable in practice.").

One state supreme court justice has lamented its expansion, predicting, "[a]t the current pace, the economic loss doctrine may consume much of tort law if left unchecked." Grams v. Milk Prods., Inc., 699 N.W.2d 167, 181 (Wis. 2005) (Abrahamson, C.J., dissenting).[16] Another commentator has identified "the principal explanation for the rise of the economic loss rule" as "a preference for private ordering over public regulation." Feinman, supra, at 817. Whatever the justification, many jurisdictions now apply the economic loss doctrine in a wide array of circumstances beyond the products liability context.

---

[16] Chief Justice Abrahamson compared the doctrine to "the ever-expanding, all-consuming alien life form portrayed in the 1958 B-movie classic *The Blob*." Grams, 699 N.W.2d at 180.

### 3. *Fraud Exception to the Economic Loss Doctrine*

As the application of the economic loss doctrine has expanded, however, courts have concurrently recognized a number of exceptions to the doctrine. Johnson, supra, at 530–32 (2009) (listing the many exceptions courts have applied); 6 Philip L. Bruner & Patrick J. O'Connor, Jr., Construction Law § 19:10 (2020) ("Exceptions to the economic loss doctrine are legion."). This appeal focuses on the so-called fraud exception to the economic loss doctrine.

Before 1995, only a few courts had considered the economic loss doctrine's application to fraud claims. See Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc., 532 N.W.2d 541, 544 (Mich. Ct. App. 1995); Katherine Heaton, Comment, Eastwood's Answer to Alejandre's Open Question: The Economic Loss Rule Should Not Bar Fraud Claims, 86 Wash. L. Rev. 331, 339 (2011) (citing Barton, supra, at 1802). Since that time, however, several courts have considered how, if at all, the economic loss doctrine applies to fraud claims. At least three approaches have emerged,[17] which are referred to in this opinion as the strict approach, the broad fraud exception, and the limited or narrow fraud exception.

The strict approach is that the economic loss doctrine bars all fraud claims. In other words, under this approach, fraud claims are not an exception to the economic loss doctrine. Courts that have adopted this rationale generally conclude "that because the economic loss rule bars recovery in tort, and because fraud is a tort, recovery of purely economic loss is therefore barred." Barton, supra, at 1811. The overarching rationale for the strict approach is that the need to provide a plaintiff with tort remedies is "diminished greatly when (1) the plaintiff can be made whole under contract law, and (2) allowing additional tort remedies will impose additional costs on society." Werwinski v. Ford Motor Co., 286 F.3d 661, 680 (3d Cir. 2002), abrogated by Earl v. NVR, Inc., 990 F.3d 310 (3d Cir. 2021). However, whether the strict approach remains viable is unclear, as the cases initially recognizing it have been overruled, abrogated, or called into question by subsequent state court decisions. See, e.g., Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364, 385–86 (D.N.J. 2004) (applying Pennsylvania law and following the Third Circuit's prediction that Pennsylvania would not recognize a fraud exception to the economic loss doctrine), called into question by Dittman v. UPMC, 196 A.3d 1036, 1054 (Pa. 2018) (allowing a negligence action for economic losses to proceed and stating that "'Pennsylvania has long recognized that purely economic losses are recoverable in a

---

[17] See, e.g., Gov't of Guam v. Kim, 2015 Guam 15 ¶ 39; Kaloti Enters., Inc. v. Kellogg Sales Co., 699 N.W.2d 205, 217 (Wis. 2005); Heaton, supra, at 339–40; Barton, supra, at 1803–12; Grant Teaster, Comment, The Confusion Continues: The New Dynamic of the Economic Loss Doctrine in Kansas, 62 U. Kan. L. Rev. 1325, 1336–38 (2014); Johnson, supra, at 568–70.

variety of tort actions' and that 'a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law'" (quoting Bilt-Rite Contractors, Inc. v. Architectural Studio, 866 A.2d 270, 288 (Pa. 2005))); see also Werwinski, 286 F.3d at 681 (applying Pennsylvania law and declining to find a fraud exception to the economic loss doctrine), abrogated by Earl, 990 F.3d at 314; Flagg Energy Dev. Corp. v. Gen. Motors Corp., 709 A.2d 1075, 1088–89 (Conn. 1998) (holding that fraud claims are not an exception to the economic loss doctrine for any contract governed by the Uniform Commercial Code), overruled by Ulbrich v. Groth, 78 A.3d 76, 99–100 (Conn. 2013).

The second approach, generally referred to as the broad fraud exception, is the majority approach at this time. See, e.g., Robinson Helicopter Co. v. Dana Corp., 102 P.3d 268, 273–74 (Cal. 2004); Van Rees v. Unleaded Software, Inc., 373 P.3d 603, 606–08 (Colo. 2016); Gov't of Guam v. Kim, 2015 Guam ¶¶ 56–65; Taylor v. Taylor, 422 P.3d 1116, 1125 (Idaho 2018); Halcrow, Inc. v. Eighth Jud. Dist. Ct., 302 P.3d 1148, 1154 n.2 (Nev. 2013); Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998). See generally Barton, supra, at 1803–05; Restatement (Third) of Torts: Liab. for Econ. Harm § 9 (2020) ("One who fraudulently makes a material misrepresentation of fact, opinion, intention, or law, for the purpose of inducing another to act or refrain from acting, is subject to liability for economic loss caused by the other's justifiable reliance on the misrepresentation.").

Under the broad approach, fraudulent inducement claims seeking economic losses are excepted because the duty not to commit fraud exists independent of any contract. See, e.g., Heaton, supra, at 339–40 (citing First Midwest Bank, N.A. v. Stewart Title Guar. Co., 843 N.E.2d 327, 333 (Ill. 2006); Moorman Mfg. Co. v. Nat'l Tank Co., 435 N.E.2d 443, 452 (Ill. 1982)). For example, the Texas Supreme Court explained that tort law "has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." Formosa Plastics, 960 S.W.2d at 46. This duty is "separate and independent from the duties established by the contract itself," so the economic loss doctrine does not apply to fraud claims regardless of whether the duties were subsumed later into the contract, or whether the losses were purely economic. Id. at 46–47; Barton, supra, at 1803–05.

These courts acknowledge that "in essence," the parties to a contract "create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks." Robinson Helicopter, 102 P.3d at 275 (quoting Applied Equip. Corp. v. Litton Saudi Arabia Ltd, 869 P.2d 454, 462 (Cal. 1994) (in bank)). "Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give [each party] only such benefits as [that party] expected to receive," because "this is the function of contract law." Id.

(quoting Applied Equipment, 869 P.2d at 462). However, this universe of expectations does not merit protecting if one party commits fraud to induce the contract because "[a] party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract." Id. at 275–76 (alteration in original) (quoting Steven C. Tourek et al., Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation, 84 Iowa L. Rev. 875, 894 (1999)). "While parties, perhaps because of their technical expertise and sophistication, can be presumed to understand and allocate the risks relating to negligent product design or manufacture, those same parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction." Id. at 277 (quoting Tourek et al., supra, at 909); see also Ralph C. Anzivino, The Fraud in the Inducement Exception to the Economic Loss Doctrine, 90 Marq. L. Rev. 921, 940–41 (2007) (stating that the broad fraud exception prevents contracting parties from using the economic loss doctrine to achieve what they have traditionally been unable to achieve by contract: limit their liability for fraud).[18]

Courts also reason that allowing tort remedies, including punitive damages, for fraudulent inducement is appropriate because fraud is socially undesirable conduct that should be punished and deterred. Robinson Helicopter, 102 P.3d at 275–76 ("In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future." (quoting Lazar v. Superior Ct., 909 P.2d 990 (Cal. 1996))); Formosa Plastics, 960 S.W.2d at 46–47 (allowing fraud-in-the-inducement claim in contract scenario, mentioning the existence of exemplary damages in distinguishing between contract and tort remedies); Abi-Najm v. Concord Condominium, LLC, 699 S.E.2d 483, 489–90 (2010) (sustaining a claim for fraud in the inducement of a contract).

But there are differing articulations of the broad exception. For example, the California Supreme Court described its holding as "narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies *and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss.*" Robinson Helicopter, 102 P.3d at 276 (Cal. 2004) (emphasis added). In contrast, the Texas Supreme Court did not limit the broad exception it adopted, stating:

---

[18] It should be noted, however, that other principles may operate independently of the economic loss doctrine to bar fraudulent inducement claims between contracting parties. For example, one scholar has opined that "a growing number of courts . . . seem to be enforcing contractual no-reliance clauses to bar claims of fraudulent inducement as a matter of law." Allen Blair, A Matter of Trust: Should No-Reliance Clauses Bar Claims for Fraudulent Inducement of Contract?, 92 Marq. L. Rev. 423, 440 (2009).

Accordingly, tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract. Allowing the recovery of fraud damages sounding in tort only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under a breach of contract claim is inconsistent with this well-established law, and also ignores the fact that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement.

Formosa Plastics, 960 S.W.2d at 47.

The third approach is commonly referred to as the narrow or limited fraud exception to the economic loss doctrine. Barton, supra, at 1806; Tourek et al., supra, at 895–96. This exception originated in Huron Tool & Engineering Co. v. Precision Consulting Services, Inc., 532 N.W.2d 541, 545 (Mich. 1995), in which a Michigan appellate court recognized an exception for fraud-in-the-inducement claims, but only if the fraud is "extraneous to the contract," not "interwoven with the breach of contract." Id. The Huron Tool Court acknowledged that:

Fraud in the inducement presents a special situation where parties to a contract negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.

Id.

The Huron Tool Court limited the exception for fraud-in-the-inducement claims, however, stating that "where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." Id. Accordingly, the court held that the "plaintiff may only pursue a claim for fraud in the inducement extraneous to the alleged breach of contract." Id. at 546.[19] The Huron Tool Court believed this

_____

[19] The Florida Supreme Court explicitly embraced the Huron Tool distinction "between fraud extraneous to the contract and fraud interwoven with the breach of contract" when it held that "[w]here a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract." HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238, 1239–40 (Fla. 1996) (quoting Huron Tool, 532 N.W.2d at 545). This distinction may now be of limited relevance in Florida, however, because the Florida Supreme Court has limited the economic loss doctrine

distinction was warranted "in light of the rationale of the economic loss doctrine." Id. at 544.

The Wisconsin Supreme Court adopted the narrow fraud exception ten years later in Kaloti Enters., Inc. v. Kellogg Sales Co., 699 N.W.2d 205, 220 (Wis. 2005). The Wisconsin Supreme Court reasoned that the narrow fraud exception serves the policies underlying the economic loss doctrine by maintaining "the fundamental distinction between tort law and contract law," which "protect[s] the parties' freedom to contract" and reinforces the fundamental contract principles that "parties are expected to negotiate and will be held to their agreements." Id. The court explained that the economic loss doctrine ensures that matters expressly or implicitly dealt with in the contract, "such as the performance or the quality or character of the goods sold, still must be addressed by contract law." Id.

In adopting the narrow fraud exception, the Kaloti Court also acknowledged Wisconsin's "long-standing principle that parties need a background of truth and fair dealing in commercial relationships." Id. (quoting Van Lare v. Vogt, Inc., 683 N.W.2d 46, 53 (Wis. 2004)). But it viewed the narrow fraud exception as consistent with that principle because, for matters extraneous to the contract, it enables courts "to address a party's failure to act honestly with tort law, even if the parties are engaging in a commercial transaction." Id. The Wisconsin Supreme Court held that "[t]ort law will apply only under circumstances . . . where one party induces another to enter into a contract by representing (or failing to disclose) a fact that would be material to the other party's decision to enter into the contract, *but that concerns matters extraneous to the contract's terms.*" Id. (emphasis added). To state a claim under this exception, the fraud must be "extraneous to, rather than interwoven with, the contract." Id. at 219 (quoting Digicorp, Inc. v. Ameritech Corp., 662 N.W.2d 652, 662 (Wis. 2003) and paraphrasing Huron Tool, 532 N.W.2d at 545). To invoke the narrow fraud exception in Wisconsin, a plaintiff must show that:

> (1) there was an intentional misrepresentation . . . ; (2) the misrepresentation occurred before the contract was formed; and (3) "the fraud [was] extraneous to, rather than interwoven with, the contract." Or stated another way, the fraud concerns matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract.

Id. (citation omitted) (quoting Digicorp Inc., 662 N.W.2d at 662).

to products liability cases, so the economic loss doctrine no longer applies to fraud claims of any sort. See Tiara, 110 So. 3d at 407.

Although the narrow fraud exception remains viable in Wisconsin and Michigan, it has not been adopted by as many jurisdictions as the broad fraud exception. Anzivino, supra, at 936; Barton, supra, at 1806; Tourek et al., supra, at 894.

Three years ago, however, the Utah Supreme Court adopted what appears to be a version of the narrow fraud exception, when it answered a certified question of law from a federal court. Healthbanc Int'l, LLC v. Synergy Worldwide, Inc., 435 P.3d 193, 194 (Utah 2018). In doing so, the Utah Supreme Court grounded its decision on Utah law and cited neither Huron Tool nor Kaloti. Id. It held that "there is no fraud exception that applies where the alleged fraudulent inducement arises out of the very grounds alleged as a basis for a breach of contract action." Id. It expressly stopped short "of resolving the broad question of whether there may ever be a fraudulent inducement exception to the economic loss rule in Utah" and deferred "that question to a future case in which the facts may warrant it." Id. But its discussion provides some guidance on the issue generally.

To begin, the Utah Supreme Court noted that the Utah economic loss doctrine "has two complementary yet distinct applications." Id. at 196. First, the economic loss doctrine applies in Utah in negligence actions to bar recovery when no contractual relationship exists between the parties and a plaintiff fails to prove either physical damage to other property or bodily injury. Id. Second, it applies when a contract exists to bar the parties from asserting actions in tort when a conflict between the parties involves the subject matter of the contract. Id. The Utah Supreme Court opined that a "blanket exception for fraud in the inducement would undermine the central premises of the economic loss rule" as it applies to the second category of cases. Id. It explained that "[t]o find a blanket exception to the economic loss rule for all fraudulent inducement claims would open the door to tort claims that directly overlap breach of contract claims. This blurring of the line between tort and contract law is precisely what the economic loss rule is designed to prevent." Id. at 197. The Utah Supreme Court further opined that the distinction some courts have drawn between failure to perform a contract and promises that induce a party to enter a contract is "illusory" "[w]hen the subject matter of the inducing promises [is] later negotiated for and included in the contract." Id.

> Contracts are negotiated first and drafted second. To claim that a promise is independent of a contract simply because it was spoken prior to the formation of a contract would open the door to tort liability for all pre-contractual negotiations that were eventually enshrined in a contract. This exception would swallow the rule. And we decline to endorse such an exception.

Id. It also disagreed that a fraud exception is necessary to avoid shielding intentional tortfeasors from liability, explaining:

> Intentional bad acts are insufficient by themselves to justify an exception to the economic loss rule. If the "bad acts" (even intentional ones) are covered by a contract, they remain in the realm of contract law. And contract law remains sufficient to "punish" the breaching party.
>
> Contract law seems sufficient to make wronged parties whole. When the contract terms contain the grounds for the tort claim, we see no reason to conclude that recovery under contract law is insufficient—"when a party is merely suing to recover the benefit of its contractual bargain, there is no inherent unfairness in limiting that party to a breach-of-contract claim." Wronged parties will still have access to traditional contract damages for breach, including expectation damages. And such parties will also have access to exceptional contract remedies—liquidated damages, rescission, etc.—where applicable. The possibility of liquidated damages seems particularly salient. If the parties to a contract with express warranties are concerned about the insufficiency of expectation damages[,] they can bargain for liquidated damages. And where they fail to do so it seems problematic for a court to make a better contract for them than the one they negotiated—by importing tort remedies into the deal.

Id. at 197–98 (quoting Louisburg Bldg. & Dev. Co. v. Albright, 252 P.3d 597, 622 (Kan. 2011)).

With this overview of the law of other jurisdictions regarding the economic loss doctrine and the fraud exception, we turn next to an overview of Tennessee law on these subjects.

### 4. The Economic Loss Doctrine in Tennessee

Tennessee courts have not yet plunged deeply into the economic loss doctrine sea. See Steven W. Feldman, The Economic Loss Doctrine: Rescuing Contract from Drowning in a "Sea of Tort", 44 Tenn. Bar J. 24, 25 (2008). This Court first mentioned the economic loss doctrine thirty years ago in John Martin Co. v. Morse/Diesel, Inc., 819 S.W.2d 428 (Tenn. 1991), but only fleetingly, even though that decision adopted a recognized exception to the economic loss doctrine—specifically section 552 of the Restatement (Second) of Torts. See Plourde Sand & Gravel, 917 A.2d at 1257 (describing section 552 as an exception to the economic loss doctrine).

In John Martin Co., this Court permitted a negligent misrepresentation claim to proceed even though the only damages alleged were economic losses. The plaintiff there, a subcontractor, filed suit alleging that the defendant construction manager negligently supplied information that the subcontractor relied upon in the construction projection. The defendant moved for summary judgment, alleging that economic losses were not recoverable in the absence of privity of contract. The trial court granted the defendant summary judgment, but the Court of Appeals reversed. This Court granted permission to appeal and concluded that section 552 permits recovery for economic losses and dispenses with privity of contract for negligent misrepresentation claims. 819 S.W.2d at 435.[20]

Four year later, this Court declined to apply section 552 as adopted in John Martin in the products liability arena. Ritter v. Custom Chemicides, Inc., 912 S.W.2d 128, 132 (Tenn. 1995) ("Section 552 does not apply to products liability cases . . . ."). In Ritter, the plaintiffs were commercial tomato growers who used Frostguard, a product manufactured by the defendant chemical plant and intended to help protect crops from the harmful effects of frost. Frostguard did not work as intended, and the plaintiffs' tomato crops suffered extensive frost damage, which, in turn, resulted in the plaintiffs' sustaining economic losses. Id. at 129. The plaintiffs sued alleging negligent misrepresentation based on the defendant's published advertisements and oral assurances targeted to the plaintiffs about Frostguard's effectiveness. The plaintiffs sought recovery for economic damages only, specifically, lost profits. The Ritter Court held that the plaintiffs' alleged losses "were caused by a defective product." Id. at 132. It stated: "Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence." Id. at 133. The Ritter Court cited an Indiana decision, Prairie Prod., Inc. v. Agchem Div.-Pennwalt Corp., 514 N.E.2d 1299, 1304 (Ind. Ct. App. 1987), as a "typical case" from another jurisdiction, which expressly followed the California Supreme Court's decision in Seely and adopted the economic loss doctrine. See Prairie Production, 514 N.E.2d at 1304. The Ritter Court concluded by declaring: "In Tennessee, the consumer does not have an action in tort for economic damages under strict liability." Ritter, 912 S.W.2d at 133. So, at least for products liability cases, Ritter implicitly adopted the economic loss doctrine.

---

[20] See also Bethlehem Steel Corp. v. Ernst & Whinney, 822 S.W.2d 592, 595 (Tenn. 1991) ("Section 552 . . . is the appropriate standard for actions by third parties against accountants based on negligent misrepresentation in this state.").

More than a decade after Ritter, this Court expressly adopted the economic loss doctrine in response to a certified question of law from a federal court asking whether the sudden calamitous event exception to the economic loss doctrine applied in Tennessee. See Lincoln Gen. Ins. Co., 293 S.W.3d 487. Before answering the certified question, the Lincoln General Court first formally and expressly adopted the economic loss doctrine. See id. at 488.

The Lincoln General Court examined the doctrine, explaining that it "is implicated in products liability cases when a defective product damages itself without causing personal injury or damage to other property." Id. at 489. It defined "economic loss" generally as "'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" Id. (quoting Comment, Manufacturers' Liability to Remote Purchases for "Economic Loss" Damages—Tort or Contract?, 114 U. Pa. L. Rev. 539, 541 (1966)). As for the scope and rationale of the doctrine, the Lincoln General Court turned to East River, explaining:

> We agree with the United States Supreme Court that the owner of a defective product that creates a risk of injury and was damaged during a fire, a crash, or other similar occurrence is in the same position as the owner of a defective product that malfunctions and simply does not work. It follows that the remedies available to these similarly situated product owners should derive from the parties' agreements, not from the law of torts, lest we disrupt the parties' allocation of risk. To hold otherwise would make it more difficult for parties to predict the consequences of their business transactions, the cost of which ultimately falls on consumers in the form of increased prices.
>
> . . . .
>
> In our view, the East River approach fairly balances the competing policy interests and clearly delineates between the law of contract and the law of tort.

Id. at 491–92 (citations omitted). The Lincoln General Court also declared the economic loss doctrine consistent with the Tennessee Products Liability Act (TPLA), explaining that the "property damage" for which the TPLA authorizes recovery refers to property other than the defective product. Id. at 491–92 (quoting Tenn. Code Ann. § 29-28-102(6)).

- 32 -

The <u>Lincoln General</u> Court commented that the economic loss doctrine is consistent with the <u>Restatement (Third) of Torts</u>, which "specifically excludes harm to the defective product itself from the definition of 'harm to persons or property' for which economic loss is recoverable." <u>Id.</u> at 493 (quoting <u>Restatement (Third) of Torts: Prods. Liab.</u> § 21 (Am. L. Inst. 1998)).

Finally, in response to the certified question, the <u>Lincoln General</u> Court declined to adopt the sudden calamitous event exception, joining the majority of other jurisdictions that had considered and rejected that exception. <u>Id.</u> at 492.

As the preceding discussion illustrates, this Court has never applied the economic loss doctrine outside the products liability context, in which it originated.

### 5. *Fraud Exception to the Economic Loss Doctrine in Tennessee*

As for the fraud exception, this Court has not previously had an opportunity to decide whether the economic loss doctrine applies to fraud claims. Unfortunately, but perhaps not surprisingly given the state of the law in other jurisdictions on this topic, Tennessee law also is unclear on this question. <u>See generally</u> Feldman, <u>supra</u>, at 27–28 (discussing the uncertainty in Tennessee law). Some decisions have been interpreted as suggesting that the economic loss doctrine applies to fraud claims seeking only economic losses. <u>See e.g.</u>, <u>Mid-South Milling Co. v. Loret Farms, Inc.</u>, 521 S.W.2d 586, 588 (Tenn. 1975) (stating that "[a] contract may be negligently or fraudulently breached and the cause of action remain in contract rather than tort."); <u>Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.</u>, 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001) (stating in dicta that the "doctrine was created by courts to avoid the 'coming collision between warranty and contract on the one hand and the torts of strict liability, negligence, fraud and misrepresentation on the other'" and reiterating that "[t]he economic loss doctrine draws the line between tort and warranty by barring recovery for economic losses in tort actions" (quoting White & Summers, <u>supra</u>, §10-5 (4th ed. 1995)), <u>abrogated on other grounds by</u> <u>Bowen ex rel. Doe v. Arnold</u>, 502 S.W.3d 102 (Tenn. 2016); <u>see also</u> <u>Cerabio LLC v. Wright Med. Tech., Inc.</u>, 410 F.3d 981, 989 n.4 (7th Cir. 2005) (relying on the dictum in <u>Trinity Industries</u> to conclude that "Tennessee also limit[s] the fraud in the inducement exception to matters not expressly addressed in the contract"). <u>See generally</u> Feldman, <u>supra</u>, at 27–28 (discussing the decisions suggesting Tennessee would not adopt an exception for fraudulent inducement claims).

Other decisions have been interpreted as suggesting that the economic loss doctrine never applies to fraud claims, even those seeking only economic losses. <u>See</u> <u>First Nat'l Bank of Louisville v. Brooks Farms</u>, 821 S.W.2d 925, 927 (Tenn. 1991) (upholding a jury verdict for fraud against a manufacturer and awarding damages for economic losses only in an appeal where the economic loss doctrine was not raised as an

- 33 -

issue); <u>Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.</u>, 131 S.W.3d 457, 463 (Tenn. Ct. App. 2003) (upholding the dismissal of a negligence claim based on the economic loss doctrine but addressing a fraud claim on the merits); <u>Exprezit Convenience Stores, LLC v. Transaction Tracking Techs., Inc.</u>, No. 305-CV-0945, 2007 WL 307237, at *10 (M.D. Tenn. Jan. 29, 2007) (noting that no Tennessee case had held that the economic loss doctrine bars a fraud in the inducement claim and declining to do so, citing decisions from other courts that had "repeatedly held that fraud in the inducement is an exception to the economic loss doctrine"). <u>See generally</u> Feldman, <u>supra</u>, at 27–28 (discussing the decisions suggesting Tennessee would adopt an exception for fraudulent inducement claims).

Having surveyed the law in Tennessee and elsewhere, today we follow the Utah Supreme Court and decline to announce a broad rule either extending the economic loss rule to all fraud claims or exempting all fraud claims from the economic loss rule. <u>Healthbanc International,</u> 435 P.3d at 194. Rather, we conclude that, for situations such as this one, involving a contract between sophisticated commercial business entities and a fraudulent inducement claim seeking recovery of economic losses only, the economic loss doctrine applies if "the only misrepresentation[s] by the dishonest party concern[] the quality or character of the goods sold." <u>Huron Tool</u>, 532 N.W.2d at 373. Under such circumstances, "the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." <u>Id.</u>

Our ruling strikes a careful balance of two concepts crucial to Tennessee law— freedom of contract and abhorrence of fraud. On the one hand, "[t]he individual right of freedom of contract is a vital aspect of personal liberty" in Tennessee. <u>Baugh v. Novak</u>, 340 S.W.3d 372, 382 (Tenn. 2011) (quoting 21 Steven W. Feldman, <u>Tennessee Practice: Contract Law and Practice</u> § 7.3, at 732 (2006)); <u>Chazen v. Trailmobile, Inc.</u>, 384 S.W.2d 1, 3 (Tenn. 1964) ("[P]ublic policy is best served by freedom of contract . . . ."). When determining whether the freedom of contract should be limited, "Tennessee's courts are well-advised to wield a scalpel rather than a sledgehammer." <u>Baugh</u>, 340 S.W.3d at 384.

On the other hand, Tennessee law takes a dim view of fraud. This Court has described it as vitiating and voiding "all human transactions, from the solemn judgment of a court to a private contract." <u>Knox-Tenn Rental Co. v. Jenkins</u>, 755 S.W.2d 33, 40 (Tenn. 1988) (quoting <u>New York Life Ins. Co. v. Nashville Trust Co.</u>, 292 S.W.2d 749, 754 (1956)). Statutes also reflect that Tennessee public policy disfavors fraud.[21]

---

[21] <u>See, e.g.</u>, Tenn. Code. Ann. § 47-1-103(b) (2001 & Supp. 2020) (stating that under Tennessee's version of the Uniform Commercial Code "the principles of law and equity, including . . . the law relative to . . . fraud [and] misrepresentation . . . supplement[s] its provisions"); Tenn. Code Ann. § 47-2-721 (providing that remedies for material misrepresentation or fraud include all remedies available

Furthermore, in Tennessee, "[a] party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing." Copeland v. Healthsouth/Methodist Rehab. Hosp., LP, 565 S.W.3d 260, 270 (Tenn. 2018).

As one commentator has noted, however, "[i]f there is a convincing rationale for the economic loss rule, it is that the rule performs a critical boundary-line function, separating the law of torts from the law of contracts." Johnson, supra, at 546. When the alleged fraud concerns pre-contractual misrepresentations and nondisclosures about the quality, reliability, and character of the goods that are the subject of a contract between sophisticated business entities, Tennessee's interest in freedom of contract prevails, and the economic loss doctrine applies.

Here, the quality and reliability of the trucks were matters about which the parties could and actually did contract. The parties are sophisticated business entities and enjoyed equal bargaining power.[22] Milan knew Navistar had chosen to utilize an emissions technology different from all of its competitors. Navistar's competitors actually warned Milan of the pitfalls of EGR-only technology and cautioned Milan that it would not be happy with the MaxxForce engine. Milan tested two ProStar trucks with MaxxForce engines before purchasing the vehicles. Milan purchased extended Warranties to protect itself from the failures that ultimately occurred, and Navistar honored these Warranties, repairing the trucks and returning them to the road. Applying the economic loss doctrine in these circumstances is consistent with its historical underpinnings and with its central purpose of preserving the boundary line between tort and contract law.

---

under title 47, chapter 2, for nonfraudulent breach); Tenn. Code Ann. § 29-26-116(a)(3) (tolling the statute of limitations for health care liability actions for fraudulent concealment by defendants); Tenn. Code Ann. § 28-3-205(b) (stating that fraud overcomes defenses such as statutes of repose); Tenn. R. Civ. P. 60.02(2) (permitting relief from final judgments tainted by fraud).

[22] See East River, 476 U.S. at 873–74 (emphasizing the fact that commercial transactions generally do not "involve large disparities in bargaining power," and, thus, contract law is "well suited" to deal with disputes involving the terms of the parties' own agreements).

We are persuaded by the reasoning articulated by the Utah Supreme Court, which, as noted earlier, recently explained:

> Contract law seems sufficient to make wronged parties whole. When the contract terms contain the grounds for the tort claim, we see no reason to conclude that recovery under contract law is insufficient—"when a party is merely suing to recover the benefit of its contractual bargain, there is no inherent unfairness in limiting that party to a breach-of-contract claim." Wronged parties will still have access to traditional contract damages for breach, including expectation damages. And such parties will also have access to exceptional contract remedies—liquidated damages, rescission, etc.—where applicable. The possibility of liquidated damages seems particularly salient. If the parties to a contract with express warranties are concerned about the insufficiency of expectation damages[,] they can bargain for liquidated damages. And where they fail to do so it seems problematic for a court to make a better contract for them than the one they negotiated—by importing tort remedies into the deal.

HealthBanc International, 435 P.3d at 197–98 (quoting Albright, 252 P.3d at 622). Accordingly, we affirm the Court of Appeals' decision holding that the economic loss doctrine bars Milan's fraudulent inducement claim.[23, 24] However, also like the Utah Supreme Court, we expressly stop short "of resolving the broad question of whether there may ever be a fraudulent inducement exception to the economic loss rule" in Tennessee and defer "that question to a future case in which the facts may warrant it." HealthBanc International, 435 P.3d at 194.

---

[23] Having concluded that Milan's fraud claim is barred by the economic loss doctrine, we need not address Navistar's other arguments that the trial court erred by refusing to admit the disclaimer as evidence relevant to show that Milan did not reasonably rely on the alleged misrepresentation and that the punitive damages award was excessive and inconsistent with Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992). We also need not address the legitimate questions Navistar has raised concerning Milan's calculation of and proof relating to lost profits and benefit-of-the-bargain damages. Finally, we need not address Navistar's claim that the UCC bars Milan's tort claim.

[24] On April 30, 2021, counsel for Milan submitted supplemental authority regarding the decision of the Ohio Court of Appeals in Navistar, Inc. v. Dutchmaid Logistics, Inc., No. 2020 CA 00003, 2021 WL 1590229 (Ohio Ct. App. Apr. 22, 2021). Counsel for Navistar and Volunteer replied on May 7, 2021. Because we conclude that the holding of that case does not bear on our analysis, we need not address it here.

### B. *Summary Judgment on Milan's Warranty Claims*

#### *1. Waiver*

The Court of Appeals concluded that Milan's failure to file a motion for new trial constituted waiver of its argument that the trial court erred by dismissing its breach of warranty claim prior to trial. Navistar asks us to affirm the Court of Appeals' decision on this point, while Milan argues that the Court of Appeals erred as a matter of law in applying waiver in these circumstances. We agree with Milan.

> An appeal as of right to the Supreme Court, Court of Appeals, or Court of Criminal Appeals shall be taken by timely filing a notice of appeal with the clerk of the appellate court as provided in Rule 4 and by service of the notice of appeal as provided in Rule 5. An appeal as of right may be taken without moving in arrest of judgment, praying for an appeal, entry of an order permitting an appeal or compliance with any other similar procedure. *Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.* Failure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal but is ground only for such action as the appellate court deems appropriate, which may include dismissal of the appeal.

Tenn. R. App. P. 3(e) (emphasis added). Regarding the relevant language of Rule 3(e), the Advisory Commission Comment from 2000 for Rule 3(e) states:

> The third sentence of Rule 3(e) does not bar an appellee who failed to move for a new trial from raising issues on appeal under Rule 13(a). That has been the practice since adoption of the Appellate Rules, and it is the conclusion reached by Prof. John Sobieski—Reporter at the time—in 46 Tenn. L. Rev. at 732–34 (1979).

In the law review article referenced in the 2000 Advisory Commission Comment, Professor Sobieski cautioned courts against interpreting Rule 3(e) as requiring an appellee to file a "disingenuous" motion for new trial simply to preserve any issues on appeal, stating that "[u]nder no circumstances . . . should an appellee be required to move for a new trial in order to obtain appellate review and relief." John L. Sobieski, Jr., <u>An</u>

Update of the New Tennessee Rules of Appellate Procedure, 46 Tenn. L. Rev. 727, 734 (1979).  We agree with this analysis of Rule 3(e) and decline to deem Milan's argument waived based on its failure to file a "disingenuous" motion for new trial.  See also Tenn. R. App. P. 1 ("These rules shall be construed to secure the just, speedy, and inexpensive determination of every proceeding on its merits."). To the extent that any Tennessee decisions may be read as requiring a party prevailing in the trial court to file a motion for new trial to preserve the opportunity to raise an issue in a cross-appeal, they are overruled.

### 2. Warranty Claims – Merits Analysis

We turn then to the merits of Milan's assertion that the trial court erred by granting Navistar summary judgment on its warranty claim.  De novo review applies to this claim.  See Rye, 477 S.W.3d at 250.  Milan's complaint alleged that the repair and replacement warranty Navistar provided failed of its essential purpose because multiple trucks required multiple repairs; repair rates exceeded Navistar's projections; and EGR cooler failure could not be permanently repaired and was a recurrent problem.

The Uniform Commercial Code authorizes a seller to contractually limit a buyer's available remedies.  Tenn. Code Ann. § 47-2-719(1) (2001).  This limitation, however, is subject to the proviso that, in the event that the circumstances cause the limited remedy in the contract to fail of its essential purpose, then the buyer may take advantage of other remedies available under the UCC.  See Tenn. Code. Ann. § 47-2-719(2) & cmt. 1; Watts v. Mercedes-Benz USA, LLC, 254 S.W.3d 422, 427 (Tenn. Ct. App. 2007) (quoting Moore v. Howard Pontiac-American, Inc., 492 S.W.2d 227, 229 (Tenn. Ct. App. 1972)). Failure of essential purpose as codified in Tennessee Code Annotated section 47-2-719 "is concerned with the essential purpose of the remedy chosen by the parties, not with the essential purpose of the code or of contract law, or of justice and/or equity."  Arcata Graphics Co. v. Heidelberg Harris, Inc., 874 S.W.2d 15, 29 (Tenn. Ct. App. 1993) (citing White & Summers, supra, § 12-10 (3d ed. 1988)).  In other words, this provision "is concerned only with novel circumstances not contemplated by the parties and does not contemplate agreements arguably oppressive at their inception."  Id. (citing White & Summers, supra, § 12-10 (3d ed.)).  The most common circumstance of a repair and replacement remedy failing of its essential purpose is if "the seller is unwilling or unable to repair the defective goods within a reasonable period of time."  Baptist Mem'l Hosp. v. Argo Const. Corp., 308 S.W.3d 337, 346 (Tenn. Ct. App. 2009) (quoting White & Summers, supra, § 12-10 (5th ed. 2000)).  Milan argues that this circumstance applies here because Navistar was unable to permanently repair the EGR cooler and prevent it from failing.

We disagree. As the trial court recognized, the Warranties required Navistar to make repairs as needed but did not impose on Navistar an obligation to ensure that the trucks would never again need repairs. Nor did the Warranties obligate Navistar "to provide trucks free from defects." To the contrary, the premise of a repair and replace warranty is that repairs may well be needed. See Nebraska Popcorn, Inc. v. Wing, 602 N.W.2d 18, 24 (Neb. 1999) ("A warranty to repair or replace does not guarantee proper performance. Rather, it anticipates potential defects and specifies the buyer's remedy during the stated period."). We agree with the trial court that Navistar fulfilled its obligations under the Warranties "by repairing or replacing parts when Milan presented the trucks for repairs covered by the [W]arranties and returning the trucks to operable condition." The undisputed proof showed that Milan accepted the repaired trucks and returned them to the road, accumulating more than sixty-five million miles of use, and that Milan then resold or continued using the repaired trucks. Milan's own expert testified that "every failure was repaired and the trucks were put back in service." Accordingly, we affirm the trial court's decision granting summary judgment on Milan's warranty claims.[25]

### C. Milan's TCPA Claim

Milan based its claim under the TCPA on Tennessee Code Annotated section 47-18-104(b)(7), which makes it unlawful to "[r]epresent[] that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Milan's claim involves its purchase of allegedly defective trucks. The TCPA defines "goods" as "any tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes or a franchise, distributorship agreement, or similar business opportunity." Tenn. Code Ann. § 47-18-103(8) (Supp. 2020). The Court of Appeals concluded that the trucks at issue are not goods as the TCPA defines that term because the trucks were purchased by a company, not an "individual" and because the trucks were purchased for use in Milan's business, not for personal, family, or household purposes" and were "clearly not a 'franchise, distributorship agreement, or similar business opportunity.'" Milan, 2019 WL 3812483, at *9. Milan argues that the Court of Appeals erred by reaching this issue and by declining to uphold the jury's verdict on its TCPA claim.

---

[25] An Iowa court and a Wisconsin court have rejected similar claims that Navistar's repair and replace warranties failed of their essential purposes. See J&R Transp., Inc. v. Navistar, Inc., No. 18-0774, 2020 WL 821947, at *3 (Iowa Ct. App. Feb. 19, 2020); Tankstar USA, Inc. v. Navistar, Inc., No. 2017AP1907, 2018 WL 6199278, at *10 (Wis. Ct. App. Nov. 27, 2018).

*1. Waiver*

Milan first argues that the Court of Appeals erred in addressing this issue at all because Navistar waived it by failing to raise the issue with particularity in its oral motion for directed verdict made during the trial. As support for this argument, Milan relies on Tennessee Rule of Civil Procedure 7.02. Navistar responds that it did not waive the issue by failing to raise it with particularity in its oral trial motion for a directed verdict because Rule 7.02 by its own terms does not apply to motions made during trial. Navistar asserts that it properly preserved the issue by raising it with particularity in its written post-trial motion seeking a judgment notwithstanding the verdict, or in the alternative, a new trial.

Navistar is correct in its assertions. Tennessee Rule of Civil Procedure 7.02 provides:

> An application to the court for an order shall be by motion which, *unless made during a hearing or trial*, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought. The requirement of writing is fulfilled if the motion is stated in a written notice of the hearing of the motion.

Tenn. R. Civ. P. 7.02(1) (emphasis added). Navistar's motion for directed verdict was made during trial, so, by its express terms, Rule 7.02(1) does not apply to that motion.

Tennessee Rule of Civil Procedure 50.02 specifically addresses motions for directed verdict and provides in relevant part:

> *Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.* Within 30 days after the entry of judgment a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict; or if a verdict was not returned, such party, within 30 days after the jury has been discharged, may move for a judgment in accordance with such party's motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.

Tenn. R. Civ. P. 50.02 (emphasis added).  When a motion for directed verdict is made and denied, "the case is deemed to have been submitted to the jury *subject to a later determination of the legal questions raised by the motion.*"  Mercer v. Vanderbilt Univ., Inc., 134 S.W.3d 121, 130 (Tenn. 2004) (emphasis added).  Any party who moves for a directed verdict may, within thirty days, file a written motion asking the trial court to enter a judgment notwithstanding the verdict.  Id.

Navistar followed this procedure.  It moved orally for a directed verdict during trial and then timely filed its post-trial motion seeking a judgment notwithstanding the verdict and in it stated with particularity its argument that the trucks are not "goods" as that term is defined by the TCPA.  By doing so, Navistar properly preserved the issue for appellate review.  Had Navistar failed to file a written post-trial motion raising the issue with particularity, its oral, general motion for directed verdict made during trial would not have been sufficient to preserve the issue.   But Navistar complied with Rule 50.02, and then filed a written post-trial motion specifically addressing the issue.  By doing so, Navistar preserved this issue for appeal.

*2. Statutory Interpretation: Are Trucks "Goods"?*

To resolve Navistar's claim on the merits, we turn to the familiar rules of statutory construction.

> A court's primary aim "is to carry out legislative intent without broadening or restricting the statute beyond its intended scope."  Courts presume that every word in a statute has meaning and purpose and that these words "should be given full effect if the obvious intention of the General Assembly is not violated by so doing."  Words "must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose."   When the meaning of a statute is clear, "[courts] apply the plain meaning without complicating the task" and enforce the statute as written . . . .

Johnson v. Hopkins, 432 S.W.3d 840, 848 (Tenn. 2013) (first quoting Lind v. Beaman Dodge, Inc., 356 S.W.3d 889, 895 (Tenn. 2011); then quoting Lind, 356 S.W.3d at 895; then quoting Mill v. Fulmarque, Inc., 360 S.W.3d 362, 368 (Tenn. 2012); and then quoting Lind, 356 S.W.3d at 895).  Applying these principles, we agree with the Court of Appeals that the trucks in this appeal are not "goods" as that term is defined in the TCPA.

As noted, the TCPA defines "goods" to mean "any tangible chattels leased, bought, or otherwise obtained for use by an *individual* primarily for personal, family, or household purposes or a franchise, distributorship agreement, or similar business opportunity." Tenn. Code Ann. § 47-18-103(8) (emphasis added). The TCPA does not define "individual," but other definitions, indicate clearly that an "individual" is distinct from "a governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized." Tenn. Code Annotated § 47-18-103(14) (defining "person"). The ordinary meaning of "individual" is "'[a] human being, [a] person.'" Mohamad v. Palestinian Auth., 566 U.S. 449, 454 (2012) (quoting 7 Oxford English Dictionary 880 (2d ed. 1989) (alterations in original)). The TCPA supports this understanding by defining and using the term "person" to encompass both individuals and corporate entities, drawing a clear distinction. Tenn. Code Ann. § 47-18-103(14) (defining "person" to encompass both "individual[s]" and various types of "legal or commercial entit[ies]"). Milan is a person within the TCPA, as it is a corporate entity. However, Milan is not an individual or natural person.

Even assuming for argument's sake that Milan somehow qualifies as an individual, the trucks still are not goods as defined by the TCPA because Milan acquired the trucks for commercial purposes not "for use . . . primarily for personal, family, or household purposes." Tenn. Code Ann. § 47-18-103(8). And, as the Court of Appeals recognized, the trucks are not "a franchise, distributorship agreement, or similar business opportunity." Tenn. Code Ann. § 47-18-103(8).

Furthermore, Milan's reliance on Hanson v. J.C. Hobbs Co., Inc., No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at *11 (Tenn. Ct. App. Nov. 21, 2012) is misplaced. There, the Court of Appeals declined to decide whether the tractor constituted goods under the TCPA, because the "catchall" provision, on which the plaintiff in Hanson relied, made "unlawful any 'act or practice which is deceptive to the consumer or to any other person,' without specifically referring to goods." Hanson, 2012 WL 5873582, at *11 (quoting Tenn. Code Ann. § 47-18-104(b)(27)). The catchall provision does not apply in this case, so Hanson is not dispositive.

The Court of Appeals correctly concluded that the trucks are not "goods" for purposes of Milan's TCPA claim, which was based on a provision that makes it unlawful to "represent[] that *goods* are of a 'particular standard, quality or grade,' or of a 'particular style or model,' if they are of another." Milan, 2019 WL 3812483, at *8 (quoting Tenn. Code Ann. § 47-18-104(b)(7)).

Having determined that Milan's TCPA claim fails as a matter of law, we also set aside the trial court's decision awarding Milan attorney's fees and costs under the TCPA against Navistar.

### D. TCPA Attorney's Fees to Volunteer

The TCPA authorizes a trial court to award attorney's fees and costs to a defendant upon finding that a private TCPA action "is frivolous, without legal or factual merit, or brought for the purpose of harassment." Tenn. Code Ann. § 47-18-109(e)(2) (2013 & Supp. 2020). This provision:

> is designed to discourage consumers from using the [TCPA] to file frivolous or baseless claims. It is not intended to punish plaintiffs who can demonstrate wrongful acts on the part of defendants, but who are unable to prevail on their claims for other reasons. Too strict an application of this subsection would result in a "winner take all" situation, regardless of the circumstances, that would undermine the purpose of protecting the consumer.

Glanton v. Bob Parks Realty, M2003-01144-COA-R3-CV, 2005 WL 1021559, at *9 (Tenn. Ct. App. Apr. 27, 2005), perm. app. denied, (Tenn. Oct. 24, 2005). Therefore, the statutory phrase "'without legal or factual merit' does not mean without sufficient merit to prevail." Id. (quoting Tenn. Code Ann. § 47-18-109(e)(2)). Rather, it refers to a TCPA claim "so utterly lacking in an adequate factual predicate or legal ground as to make the filing of such a claim highly unlikely to succeed." Id. This standard does not permit an appellate court to substitute its judgment for that of the trial court. See id. (applying the abuse of discretion standard to review attorneys' fees); Borne v. Celadon Trucking Servs., Inc., 532 S.W.3d 274, 294 (Tenn. 2017) ("The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." (quoting Eldridge v. Eldridge, 42 S.W.3d 82, 85 (Tenn. 2001)).

The trial court here awarded Volunteer attorney fees and costs upon concluding that Milan's claim against Volunteer was lacking an adequate factual predicate. Milan filed its claim on November 13, 2014, suing Volunteer along with Navistar. Volunteer later filed a motion for summary judgment. Milan filed a response in opposition to the motion and submitted an affidavit from Mr. Ross, in which he asserted that certain Volunteer executives misrepresented the MaxxForce engine and convinced Milan to buy more trucks. Relying on this reply, the trial court denied Volunteer's motion for summary judgment *one day before trial*, concluding that disputes of material fact remained on Milan's TCPA claim.

However, during Mr. Ross's testimony at trial, he did not attribute any misrepresentations to Volunteer representatives. In fact, he agreed that Volunteer's owner was "a good man" and an "honest man" and had been a "social friend" prior to the lawsuit.

At the close of Milan's proof, the trial court granted Volunteer's motion for a directed verdict. After trial, Volunteer moved for attorney's fees under the TCPA. The trial court ruled on the motion from the bench on December 7, 2017, and advised Milan's counsel "how shocking it was to the Court as to this [trial] testimony versus the cause of action that existed." The trial court stated that it had "no problem" granting Volunteer a directed verdict at the close of Milan's proof, and found that Milan's TCPA claim, as it related to Volunteer, lacked factual merit.

Milan argues that the trial court abused its discretion in doing so and points to the trial court's prior denial of Volunteer's motion for summary judgment. Milan's argument is mistaken. The trial court's denial of Volunteer's motion for summary judgment signaled only that Milan's response in opposition was sufficient to convince the trial court that disputes of material fact remained. When Milan later failed to put on any factual proof at trial supporting its TCPA claim against Volunteer, we cannot say that the trial court abused its discretion by finding that Milan's claim against Volunteer was so utterly lacking in an adequate factual predicate as to make the filing of such a claim highly unlikely to succeed.

We note that Milan's counsel did not actually oppose Volunteer's motion for directed verdict and indicated its decision not to present factual evidence against Volunteer was a matter of trial strategy.[26] Milan is now bound by the consequences of its strategy to pursue a TCPA claim so utterly lacking in an adequate factual predicate as to make the filing of such a claim highly unlikely to succeed. The trial court did not abuse its discretion in awarding Volunteer attorney's fees.

---

[26] When the trial court invited counsel to comment on Volunteer's motion for directed verdict, the following colloquy occurred:

> Milan's Counsel: I will comment that we filed a response to summary judgment. The Court properly denied the summary judgment, finding there's a fact issue. We've put our case on the way we put it on for reasons that we put it on. Does that answer your question?

> Trial Court: Yes. [Milan's] counsel has been very candid.
> Milan's Counsel: And that's a matter of trial strategy.

For this same reason, we grant Volunteer's request for attorney's fees on appeal. See Killingsworth v. Ted Russell Ford Inc., 205 S.W.3d 406, 409 (Tenn. 2006). See also Martin v. Franklin Cool Springs Corp., No. M2014-01804-COA-R3-CV, 2015 WL 7062124, at *5, *7 (Ct. App. Tenn. Nov. 10, 2015). A party that properly recovers fees in the trial court need not show that an appeal is independently meritless: the rationale supporting fees in the trial court carries over and supports the defense of the award on appeal. This matter is remanded to the trial court for a determination of reasonable fees on appeal.

## IV. Conclusion

We affirm the Court of Appeals' judgment on the separate grounds stated herein and remand this matter to the trial court for a determination of Volunteer's reasonable attorney's fees on appeal. Costs of this appeal are taxed against Milan.

_____
CORNELIA A. CLARK, JUSTICE